USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/5/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

TRUSTEES OF THE ELEVATOR CONSTRUCTORS
UNION LOCAL NO. 1 ANNUITY AND 401(k) FUND;
TRUSTEES OF THE ELEVATOR CONSTRUCTORS
UNION LOCAL NO. 1 EDUCATION AND
APPRENTICE TRAINING FUND, TRUSTEES OF
THE NATIONAL ELEVATOR INDUSTRY HEALTH
BENEFIT PLAN, TRUSTEES OF THE NATIONAL
ELEVATOR INDUSTRY PENSION PLAN,
TRUSTEES OF THE NATIONAL ELEVATOR
INDUSTRY EDUCATIONAL PROGRAM,
and TRUSTEES OF THE NATIONAL ELEVATOR
INDUSTRY WORK PRESERVATION FUND,

                                  Plaintiffs,

                    -v-

K.A.N. ELEVATOR INC., and NORTH AMERICAN
ELEVATOR INC.,

                                  Defendants.

------------------------------------------------------------------X

16 Civ. 7408 (PAE)

OPINION & ORDER

**PAUL A. ENGELMAYER, District Judge:**

       Plaintiffs—a series of multi-employer benefit plans and a labor-management cooperation committee—bring this action against two elevator contractors, North American Elevator Inc. and K.A.N. Elevator Inc., alleging delinquent employer contributions under Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132 and 1145 ("ERISA"), and Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

       Pending now are the parties' cross-motions for summary judgment. The parties seek a judicial determination as to whether defendants should be held jointly liable for certain unpaid employer contributions because they constitute either a single employer or alter egos of one

1

another. Because a reasonable jury could find in either party's favor based on the evidence adduced at summary judgment, the Court denies each party's motion for summary judgment.

I.    **Factual Background**[1]

   A.    **The Parties**

Plaintiffs are Trustees of the Elevator Contractors Union Local No. 1 Annuity and 401(k) Funds, Trustees of the Elevator Contractors Union Local No. 1 Education and Apprentice Training Funds (the "Local Funds"), Trustees of the National Elevator Industry Health Benefit

---

[1] The Court draws its account of the facts of this case from the parties' submissions in support of and in opposition to the motions for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 82 ("JSF"); the declaration of Leonard Legotte in support of plaintiffs' motion for summary judgment, Dkt. 88 ("Legotte Decl."); the declarations of Todd Dickerson in support of plaintiffs' motion for summary judgment, Dkts. 90 and 113 ("First Dickerson Decl." and "Second Dickerson Decl.," respectively); plaintiffs' Local Rule 56.1 statement, Dkt. 92 ("Pl. 56.1"); defendants' Local Rule 56.1 statement, Dkt. 103-2 ("Def. 56.1"); the first declaration of John M. Harras in support of defendants' motion and in opposition to plaintiffs' motion, Dkt. 104 ("Harras Decl."); and plaintiffs' counter-statement to defendants' Local Rule 56.1 statement, Dkt. 111 ("Pl. Counter 56.1").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Defendants failed to provide, in accordance with Rule 56.1, a counter-statement to plaintiffs' Rule 56.1 statement. Rather, defendants included, at the close of their own Rule 56.1 statement, a section entitled "Other Relevant Facts," which "responds to certain factual allegation raised by plaintiffs' Local Rule [statement] with necessary clarifications and contextualization." Def. 56.1 ¶¶ 151–88. Although defendants failed to provide a formal separate counter-statement, on the circumstances here, the Court does not perceive material prejudice to plaintiffs from defendants' use of an alternative format, and therefore will not deem the facts in plaintiffs' Rule 56.1 statement admitted. Nevertheless, as the litigation moves forward, the Court expects the defense to observe more scrupulously the governing rules.

Plan, Trustees of the National Elevator Industry Pension Plan, Trustees of the National Elevator Industry Educational Program, and Trustees of the National Elevator Industry Work Preservation Fund (the "National Funds," and, together with the Local Funds, the "Funds" or "plaintiffs"). Apart from the Work Preservation Fund, which is a "labor-management cooperation committee," plaintiffs are "multi-employer benefit plans." Employers bound by collective bargaining agreements with the Local Union No. 1 International Union of Elevator Constructors (the "Union") are required to remit contributions to the Funds pursuant to those agreements. Pl. 56.1 ¶¶ 12–15; Legotte Decl. ¶¶ 3–5.

Defendant K.A.N. Elevator Inc. ("K.A.N.") is an elevator contractor formed in 2006 by owner Kevin Heis. JSF ¶¶ 10, 12, 28. At all times relevant here, K.A.N. was primarily engaged in elevator installation in New York and New Jersey. *Id.* ¶¶ 30, 32. On May 24, 2010, K.A.N. signed a Joinder Agreement in which it agreed to be bound, through March 17, 2014, by the existing collective bargaining agreement between the Union and the Thyssen Krupp Elevator Corporation. *Id.* ¶ 22. On March 17, 2014, K.A.N. signed a second Joinder Agreement, agreeing to be bound by a collective bargaining agreement between the Union and the Elevator Manufacturers Association of New York, Inc. *Id.* ¶ 23.

Under the Joinder Agreements, K.A.N. became bound by the Funds' Trust Agreements, requiring K.A.N. to remit contributions to the Funds. Additionally, the Funds' Trust Agreements required K.A.N. to submit to audits to determine whether all required benefit contributions had been remitted. *Id.* ¶¶ 24–26. From 2013–2016, K.A.N. employed between three and nine employees, each of whom was a member of the Union. Pl. Counter 56.1 ¶ 24.

Defendant North American Elevator Inc. ("North American") was formed in 2008 as an elevator contractor by owner Thomas Curran. JSF ¶¶ 11, 13, 27. At all times relevant here,

North American performed elevator installation, service, repair, design, modernization, and violation removal in New York and New Jersey, either through subcontractors like K.A.N. or on its own. *Id.* ¶¶ 30–31; Pl. Counter 56.1 ¶ 54. From 2013–2016, North American employed between 31 and 51 employees. Pl. Counter 56.1 ¶ 85. Unlike K.A.N., North American was not a signatory to a collective bargaining agreement with the Union. JSF ¶ 11.

**B.     The Relationship between North American and K.A.N.**

Heis (K.A.N.'s owner) and Curran (North American's owner) first met in 2006. Pl. Counter 56.1 ¶ 104. In 2008, K.A.N. began to perform some elevator installation work for North American, charging a per-elevator price. *See id.* ¶¶ 107–08.

Around the time in 2010 that K.A.N. agreed to be bound by the collective bargaining agreement, North American and K.A.N. (collectively, "defendants") entered into a "verbal agreement" under which K.A.N. performed elevator installation for North American, and North American paid K.A.N.'s labor costs and supplied materials for those projects.[2] North American also agreed to pay K.A.N. $1,500 per week, regardless of how much work K.A.N. actually performed for North American. JSF ¶¶ 48, 51; JSF Ex. 2 ("Heis Tr.") at 181. Additionally, North American and K.A.N. shared a general liability insurance policy, and North American paid the premiums on K.A.N.'s behalf. Pl. 56.1 ¶ 73.

Notwithstanding the verbal agreement between K.A.N. and North American, Heis retained sole authority to hire or fire K.A.N. employees, and to set their wage rates and hours consistent with the collective bargaining agreements. Pl. Counter 56.1 ¶¶ 25–26. Curran,

---

[2] Labor costs included "the union hourly wage rate and benefit contribution rate for K.A.N.'s employees working on the job plus insurance." Pl. Counter 56.1 ¶ 112.

4

meanwhile, retained sole control over the wages, hours, and employment status of North American employees. Pl. Counter 56.1 ¶¶ 97–99.

North American did, however, perform numerous administrative functions for K.A.N., which had no administrative office of its own. As a general matter, North American processed K.A.N.'s payroll and remitted contributions to the Funds on K.A.N.'s behalf. JSF ¶ 34. To facilitate these contributions, K.A.N. employees submitted weekly timesheets to North American's payroll department. *Id.* ¶ 35. Further, K.A.N. employees' paystubs listed a North American phone number, and K.A.N.'s Forms W-3 listed Curran as K.A.N.'s contact person in 2013, and listed his wife, Susanna Curran, in 2015 and 2016. *Id.* ¶¶ 42–44.

North American also remitted contributions to the Funds and communicated with the Funds on K.A.N.'s behalf. *Id.* ¶¶ 34, 46. Specifically, North American bookkeepers completed and submitted remittance and contributions billing reports to the Funds on K.A.N.'s behalf. *Id.* ¶ 38. These reports listed North American's address. *Id.* ¶ 39. Likewise, before February 2015, the email address provided on K.A.N.'s remittance reports was that of a North American bookkeeper (labad.NAE@gmail.com). *Id.* ¶ 40. In or around February 2015, the email address was changed to one associated with K.A.N. (K.A.N.elevator.inc@gmail.com), which anther North American bookkeeper used to communicate with the Funds on K.A.N.'s behalf. *Id.* ¶¶ 40, 46.

Curran possessed signatory authority over a bank account maintained by K.A.N and was listed as a "manager" on K.A.N.'s Corporate Certificate of Resolution on file with the bank. *Id.* ¶¶ 36, 53. Curran also personally signed checks on K.A.N.'s behalf. *Id.* ¶ 37. Defendants contend that the bank account was used for payroll purposes and "to facilitate [North American's] back-office support." Def. 56.1 ¶ 118; *see also* Heis Tr. 248 ("It was money that

was owed to my company [K.A.N.] that was being written out for payroll and for benefits."); JSF Ex. 1 ("T. Curran Tr.") at 215 ("K.A.N.'s money is specifically for payroll and the union benefits."). Plaintiffs, however, claim that the bank account was used to "funnel money to North American" on at least one project, during which K.A.N. transferred funds from this account to North American's account whenever K.A.N. received payments. *See* Pl. Counter 56.1 ¶ 118; Pl. 56.1 ¶¶ 152–54; *see also* First Dickerson Decl. Ex. 78; Second Dickerson Decl. Ex. 100.[3]

The companies also shared some overlapping personnel, at least on paper. A North American employee listed Heis as Vice President of Construction on a North American personnel form and as a Principal on another North American form. Pl. Counter 56.1 ¶¶ 156, 159. That same North American employee also drafted a number of bids on behalf of K.A.N. Pl. Counter 56.1 ¶ 166. She also listed herself as "K.A.N. manager service/sales" on at least one agreement between K.A.N. and a third party. First Dickerson Decl. Ex. 66.

Aside from K.A.N., North American contracted with six additional elevator subcontractors: Skyscraper, Nyaah, G-Tech, Platinum, Hi-Tech, and Dolman. JSF ¶ 33; T. Curran Tr. 18. Although North American provided materials and heavy equipment to all of these subcontractors, Pl. Counter 56.1 ¶ 67, only K.A.N. received administrative support from North American in the form of payroll management and a weekly $1,500 payment, T. Curran Tr. 22–25; Pl. Counter 56.1 ¶ 68. Other subcontractors negotiated hourly rates with North American. Pl. Counter 56.1 ¶¶ 63–64; T. Curran Tr. 22–24.

Between September 2014 and January 2016, North American performed 347 jobs, either on its own or spread across its several subcontractors, while K.A.N. performed 15, all

---

[3] These exhibits are partially or fully redacted on the public docket. The Court has received and reviewed the unredacted documents in camera.

subcontracted from North American. Pl. Counter 56.1 ¶ 144; Harras Decl. Ex. 94. Each year from 2011 to 2016, North American paid K.A.N. more than it paid any of the other six subcontractors. First Dickerson Decl. Ex. 51. Often, K.A.N. received the majority of North American's subcontracting payments (*e.g.*, from 2011–2016, payments to K.A.N. comprised between 44% and 76% of the total amount North American paid out to all seven subcontractors). Pl. 56.1 ¶ 57; First Dickerson Decl. Ex. 51. North American also offered jobs to K.A.N. before any other subcontractor, giving K.A.N. a right of first refusal. Heis Tr. 64 ("[T]he jobs roll in [to North American] when they roll in, and, you know, either I take it or [North American] gives it to somebody else depending on how busy I am."). Approximately 98% of K.A.N.'s revenue over the past six years was attributable to elevator installation work performed for North American. Pl. 56.1 ¶ 55; Heis Tr. 27.

North American and K.A.N. also performed elevator work on a number of shared projects. For instance, K.A.N. and North American performed elevator modernization in separate buildings as part of one project on Grant Street in New York City. For other projects in New York City, K.A.N. installed elevators that North American would later service. North American also installed elevators at the same time as K.A.N. for another general contractor, Related Companies. JSF ¶¶ 54–60.

The parties dispute the extent to which K.A.N. employees worked with and/or supervised North American employees. Defendants contend that "KAN employees and [North American] employees rarely worked on the same job at the same time, and, if they did, they would be working on different elevator banks/shafts, with no cross-over on-site supervision between KAN and [North American] and virtually no interaction among [North American] and KAN employees." Def. 56.1 ¶ 145; *see also* T. Curran Tr. 70 (Curran testifying he did not speak to

7

K.A.N. employees); Heis Tr. 122 (Heis testifying K.A.N. employees did not interact with North American project managers). Plaintiffs, however, maintain that "[d]efendants routinely worked on the same projects, oftentimes in a highly-coordinated manner, and there was significant interaction between their employees." Pl. Counter 56.1 ¶ 145; *see also* JSF Ex. 5 ("McDonagh Tr.") at 24–26 (North American employee testifying that Heis gave instructions to North American employees on one project); JSF Ex. 8 ("Becker Tr.") at 54 (K.A.N. employee testifying that Heis directed him to assist on North American projects without any other K.A.N. employees); JSF Ex. 9 ("Nicki-Perry Tr.") at 60, 78 (North American employee testifying that Heis oversaw construction on two projects where K.A.N. and North American jointly installed elevators).

**C.   Audits**

Audits conducted during this litigation determined that from November 1, 2011 to December 31, 2016, K.A.N. owed to the Local Funds: (1) $41,956.38 in unpaid contributions to the Local Annuity and 401(k) Fund; (2) $10,373.91 in interest on those unpaid contributions; (3) $813.62 in unpaid contributions to the Local Education and Apprentice Training ("EAT") Fund; and (4) $186.59 in interest on those unpaid contributions. For the same period, audits determined that K.A.N. owed to the National Funds: (1) $81,723.61 in unpaid contributions and (2) $7,124.88 in interest on those unpaid contributions. JSF ¶¶ 70, 72. In total, K.A.N. owes approximately $142,179 in unpaid contributions and interest. Defendants do not dispute K.A.N.'s liability for these contributions. *See* Dkt. 103-1 at 25.

However, the parties do dispute not only whether North American is liable for K.A.N.'s unpaid contributions, but also whether North American must remit contributions for its *own* employees. *See* Dkt. 103-1 at 25. As to the latter possibility, audits determined that from

8

September 22, 2010 to December 31, 2016, North American would owe to the Local Funds: (1) $1,135,338.77 in unpaid contributions to the Local Annuity and 401(k) Fund; (2) $304,262.36 in interest on those unpaid contributions; (3) $20,770.36 in unpaid contributions to the Local EAT Fund; and (4) $5,288.50 in interest on those unpaid contributions. Additionally, over the same time period, auditors determined that North American would owe to the National Funds: (1) $2,982,915.25 in unpaid contributions and (2) $275,591.77 in interest. JSF ¶¶ 71, 73. In total, if North American were held liable for contributions for its own employees, its liability would be approximately $4,724,167. Defendants do not dispute this calculation, assuming liability. *See* Dkt. 103-1 at 25.

## II. Procedural History

On September 22, 2016, the Local Funds filed an initial complaint, bringing claims against North American and K.A.N. Dkt. 1.

On December 15, 2016, defendants moved to dismiss the complaint, Dkt. 17, and on February 7, 2017, the Court denied the motion, Dkt. 32.

On May 26, 2017, the Local Funds filed an amended complaint, Dkt. 57, and on July 31, 2017, the Local Funds filed a second amended complaint—now the operative complaint—joining the National Funds as plaintiffs, Dkt. 68.

On October 5, 2017, the Court held a pre-motion conference in anticipation of the parties' motions for summary judgment. See Dkt. 81.

On November 16, 2017, plaintiffs filed a motion for summary judgment, Dkt. 86, a memorandum of law in support, Dkt. 87 ("Pl. Br."), and a series of declarations, Dkts. 88–90. On January 5, 2018, defendants filed a motion for summary judgment, Dkt. 103, a memorandum of law in support and in opposition to plaintiffs' motion, Dkt. 103-1 ("Def. Br."), and a series of

9

declarations, Dkts. 104–05. On February 2, 2018, plaintiffs filed a memorandum of law in opposition to defendants' motion and in further support of their own. Dkt. 110. Finally, on February 16, 2018, defendants filed a reply memorandum of law in support of their motion. Dkt. 115.

### III. Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the

10

party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (quotation marks omitted).

"A court faced with cross-motions for summary judgment need not grant judgment as a matter of law for one side or the other, but must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Al Hirschfeld Foundation v. Margo Feiden Galleries Ltd.*, 296 F. Supp. 3d 627, 636 (S.D.N.Y. 2017) (quoting *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 435 (S.D.N.Y. 2016)) (quotation marks omitted). "[S]ummary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## IV. Discussion

The parties do not dispute K.A.N.'s liability to the Funds for unpaid contributions with respect to its employees.[4] Rather, their dispute centers on two questions: first, whether North American is also liable for K.A.N.'s unpaid contributions because the two companies constitute a single employer; and second, and more financially consequentially, whether North American also must pay contributions for its *own* employees, on the theory that it is bound by K.A.N.'s collective bargaining agreements, either because the two companies constitute a single employer whose employees function as a single appropriate bargaining unit, or because the two companies are alter egos.

---

[4] As a result, it appears that defendants' motion should have been styled a motion for *partial* summary judgment. In any event, the nomenclature is academic in light of this decision.

11

Whether entities constitute a single employer or alter egos are questions of fact. *See Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 747 (2d Cir. 1998). Accordingly, summary judgment is appropriate only if no reasonable juror could conclude, on the facts available at summary judgment, that defendants either did or did not constitute a single employer or alter egos. *See, e.g., Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp.*, No. 13-CV-4363 (SJF)(ARL), 2015 WL 790085, at *8 (E.D.N.Y. Feb. 24, 2015) ("[T]he evidence is not so one-sided as to preclude a reasonable factfinder from holding in favor of either party . . . .").

### A. Single Employer Theory

"The single employer doctrine binds a non-signatory employer to a collective bargaining agreement if the two companies constitute a single employer and the employees of the companies constitute a single appropriate bargaining unit." *Mason Tenders Dist. Council of Greater N.Y. v. Fortune Interiors Dismantling Corp.*, No. 12CV-4253 (PAC), 2015 WL 4503630, at *3 (S.D.N.Y. July 23, 2015). A finding of single employer status, alone, is insufficient to bind an entity to the other's collective bargaining agreement; rather, the entities must also constitute a single employee bargaining unit. *See Lihli*, 80 F.3d at 747; *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001). Nevertheless, that entities are a single employer "has independent legal significance. Specifically, that finding is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under the collective bargaining agreement." *Lihli*, 80 F.3d at 748; *see also Mason Tenders Dist. Council Welfare Fund v. ITRI Brick & Concrete Corp.*, No. 96 Civ. 6754 (AJP)(LAK), 1997 WL 678164, at *12 (S.D.N.Y. Oct. 31, 1997).

In order to determine whether two or more employers constitute a single employer, courts consider four factors: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership. *ITRI Brick*, 1997 WL 678164, at *12; *see also Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); *Lihli*, 80 F.3d at 747. The Second Circuit also considers relevant "the use of common office facilities and equipment and family connections between or among enterprises." *Lihli*, 80 F.3d at 747.

"To demonstrate single employer status, not every factor need be present, and no particular factor is controlling." *Id.* The focus is on "all the circumstances of the case" and whether there is an "absence of an arm's length relationship" between the entities. *Id.* (quoting *N.L.R.B. v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir. 1983)) (quotation marks omitted). Nevertheless, courts have held that the second factor—centralized control of labor relations—is the "most important of the four factors," and that the third and fourth factors—common management and common ownership—are "accorded less weight." *Laurin v. Pokoik*, No. 02-CV-1938 (LMM), 2004 WL 513999, at *4, *8 (S.D.N.Y. Mar. 15, 2004); *see also Ferrara v. Oakfield Leasing, Inc.*, 904 F. Supp. 2d 249, 263 (E.D.N.Y. 2012); *Finkel v. Frattarelli Brothers, Inc.*, No. 05-CV-1551 (JFB)(AKT), 2008 WL 2483291, at *12 (E.D.N.Y. June 17, 2008).

Where there are genuine issues of material fact as to whether entities constitute a single employer, summary judgment is improper. *See, e.g., Fortune Interiors*, 2015 WL 4503630, at *3; *JJJ Concrete Corp.*, 2015 WL 790085, at *7; *ITRI Brick*, 1997 WL 678164, at *15.

For the reasons set forth below, the Court cannot determine as a matter of law whether North American and K.A.N. constitute a single employer. As the Court will explain, the first factor—interrelation of operations—favors a finding that defendants are a single employer, while

the second factor—centralized control of labor relations—favors the opposite conclusion. At the same time, outstanding factual disputes prevent the Court from determining which outcome the third and fourth factors (common management and ownership) favor. Accordingly, on the evidence presented at summary judgment, and after consideration of the factors to which those facts pertain, a reasonable jury could find either that North American and K.A.N. are a single employer or that they are not. As a result, the Court cannot grant summary judgment on this point in either party's favor. *See, e.g., Fortune Interiors*, 2015 WL 4503630, at *4 ("Plaintiffs have not presented conclusive evidence to determine as a matter of law that Silver and Fortune are a single employer. Accordingly, there is a genuine issue of material fact regarding whether Fortune and Silver have a single employer relationship, which is for a jury to resolve.").

### 1. Interrelation of Operations

Based on the summary judgment record, the strongest factor inclining toward a finding of single employer status is interrelation of operations. K.A.N. and North American effectively share an office. *See* JSF ¶ 34; *see, e.g., Labarbera v. Cretty Enters., Inc.*, Nos. 03-6112, 04-5178 (DRH)(ARL), 2007 WL 4232765, at *5 (E.D.N.Y. Nov. 28, 2007) ("The interrelationship of operations is met as the two corporations share office space [and] office support functions . . . ."); *Ferrara*, 904 F. Supp. 2d at 261. Further, that North American performed the vast majority of K.A.N.'s administrative functions, including communicating with the Funds, processing K.A.N.'s payroll, and signing checks on K.A.N.'s behalf, strongly suggests interrelated operations. *See* JSF ¶¶ 34–46; *see, e.g., Finkel*, 2008 WL 2483291, at *4, *11 (overlap in operations where one entity submitted remittance reports and paid contributions to employee benefits funds on behalf of other entity); *Trs. of the Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329,

341–42 (E.D.N.Y. 2017) (shared finances, bank accounts, offices, and telephone numbers are "standard indications" of common operations).

Moreover, K.A.N. worked almost exclusively on North American projects, including, at least occasionally, working with North American on the same projects. JSF ¶¶ 54, 58–60; Pl. 56.1 ¶ 55. Further, North American subcontracted more elevator installation work to K.A.N. than to any other subcontractor. Pl. 56.1 ¶¶ 57; Heis Tr. 27; First Dickerson Decl. Ex. 51; *see e.g.*, *Lihli*, 80 F.3d at 747 (overlap in operations where two entities provided goods and services exclusively to one another). Likewise, K.A.N. shared equipment and many customers with North American. JSF ¶¶ 52, 54–61; *see, e.g.*, *Ferrara*, 904 F. Supp. 2d at 262 (interrelation of operations where entities' customers overlapped). *But see Moore v. Navillus Tile, Inc.*, 276 F. Supp. 3d 110, 149–50 (S.D.N.Y. 2017) (noting evidence that "contractors on major construction projects in New York City all deal with a common set of customers" and therefore disclaiming reliance on this fact in alter ego analysis).

### 2. Centralized Control of Labor Relations

By contrast, the centralized control of labor relations factor tends to undermine a finding of single employer status. Heis and Curran each retained sole authority to hire and fire his respective company's employees, as well as set their wages. Pl. Counter 56.1 ¶¶ 25–26, 97, 99; *see, e.g.*, *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30–31 (2d Cir. 2015) (no centralized control where first entity "exercised no control over management or personnel decisions" at second entity); *Time Square Const., Inc. v. Mason Tenders Dist. Council of Greater N.Y. and Long Island*, No. 07-CV-7250 (SAS), 2008 WL 55116, at *6 (S.D.N.Y Jan. 2, 2008) (no centralized control given "no convincing evidence that Navillus played any role in Time Square's employment decisions").

Further, although there is uncontroverted evidence that employees of K.A.N. and North American worked on at least some overlapping projects, the extent of employee interchange here is substantially less than in other cases in which courts have held two entities to be a single employer. *See, e.g., Ferrara*, 904 F. Supp. 2d at 263 (employees shifted between both entities); *Finkel*, 2008 WL 2483291, at *4 ("[D]rivers who were reported to the Funds as having worked for Podesta Trucking were actually drivers for Frattarelli Brothers."); *Labarbera*, 2007 WL 4232765, at *2 ("Cretty and Asbestos share common drivers and use the same dispatchers . . . .").

### 3. Common Management

Factual disputes exist regarding common management. On one hand, a North American employee listed Heis as a North American Vice President or Principal on multiple forms, and described herself as a K.A.N. employee on at least one bid she drafted on behalf of K.A.N. Pl. Counter 56.1 ¶¶ 156, 159, 166; First Dickerson Decl. Ex. 66. Likewise, North American employees were listed as contacts on K.A.N. employees' timesheets, First Dickerson Decl. Ex. 67A–D, 68, Heis was included as a contact on North American employees' timesheets, *id.* 69–70, and Curran was listed as manager on K.A.N.'s bank account, JSF ¶ 53.

On the other hand, the extent of common management in the field is disputed. *Compare* McDonagh Tr. 24–26, *and* Nicki-Perry Tr. 60, 78 (testimony that Heis, despite K.A.N.'s smaller size, supervised North American employees and shared jobsites), *with* T. Curran Tr. 70, Heis Tr. 122, JSF Ex. 7 ("Trevino Tr.") at 17–18, *and* JSF Ex. 6 ("Heis Jr. Tr.") at 21, 27 (testimony that employees of one entity neither received nor provided directives to employees of the other).

In light of the equivocal, disputed evidence as to defendants' "interlocking officers and directors," *E.E.O.C. v. Grace Episcopal Church of Whitestone, Inc.*, No. 06-CV-5302

(ERK)(WDW), 2007 WL 6831007, at *6 (E.D.N.Y. July 3, 2007) (quotation marks omitted), the Court cannot determine the import of this factor.

### 4. Common Ownership

Nominally, North American and K.A.N. do not share common ownership. *See* JSF ¶¶ 12, 13. And this is not a case in which the entities are owned by the same family, or are otherwise connected by close bonds of history or affection. *See, e.g., Lihli*, 80 F.3d at 746–47 (overlapping ownership by members of same family); *Ferrara*, 904 F. Supp. 2d at 263–64 (both entities owned by same family); *Laurin*, 2004 WL 513999, at *8 (families owning each entity had been "associated for generations").

Nevertheless, certain facts suggest something less than an arm's length relationship between the defendants here. *See Finkel*, 2008 WL 2483291, at *12. First, Heis received a consistent $1,500 weekly payment from North American regardless of the amount of work K.A.N. performed. And despite performing a substantial number of projects for North American, Heis never renegotiated this recurring payment, such that the payment remained fixed at $1,500 for seven years. *See* JSF ¶ 51; Heis Tr. 181–82. Second, K.A.N. possessed a right of first refusal on any North American elevator installation projects—a right not enjoyed by any of K.A.N.'s competitors. *See* Pl. 56.1 ¶ 58; Heis Tr. 64.

In view of these potentially conflicting facts, the Court cannot conclusively determine whether this factor favors or disfavors a finding of single employer status.

### 5. Conclusion

Given that two of the single employer factors point in opposite directions, and that the parties otherwise dispute material questions of fact, "the evidence is not so one-sided as to preclude a reasonable factfinder from holding in favor of either party . . . ." *JJJ Concrete Corp.*,

17

2015 WL 790085, at *8; *see also Fortune Interiors*, 2015 WL 4503630, at *4 ("[W]hile this evidence suggests that the companies may be a single employer, it is not so overwhelming that it precludes any possibility that the companies are not a single employer."). Accordingly, the Court cannot determine as a matter of law that defendants constitute a single employer.[5]

### B. Alter Ego Theory

"The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Ret. Plan of the UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL–CIO v. N.L.R.B.*, 261 F.3d 291, 298 (2d Cir. 2001)); *see also Lihli*, 80 F.3d at 748. While the factors used to evaluate alter ego status are similar to those used to evaluate single employer status, such as "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership," *Goodman Piping Prods., Inc. v. N.L.R.B.*, 741 F.2d 10, 11 (2d Cir. 1984), the two doctrines are "conceptually distinct," *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991); *accord Brown*, 250 F.3d at 128 n.3. Unlike

---

[5] Had the Court held that defendants constitute a single employer, it would then have considered whether employees of North American and K.A.N. constitute a single appropriate bargaining unit, so as to bind North American, a non-signatory, to the collective bargaining agreements with respect to its own employees. *See Lihli*, 80 F.3d at 747; *Fortune Interiors*, 2015 WL 4503630, at *3. However, the Court need not reach this question, as the Court cannot determine as a matter of law that defendants are a single employer.

in the single employer inquiry, anti-union animus may be germane, or even sufficient, to establish alter ego status, although it is not necessary. *Goodman Piping*, 741 F.2d at 12.[6]

Plaintiffs contend that North American and K.A.N. are alter egos "[g]iven Defendants' extensive interrelatedness, North American's domination and control of K.A.N.'s operations, and the overall lack of an arm's length relationship." Pl. Br. 21–22. However, on the basis of the factual record at summary judgment, the alter ego factors, as well as the facts on which they are based, point in competing directions, thus precluding summary judgment in either party's favor.

As explained above, genuine issues of material fact preclude a determination that K.A.N. and North American have substantially identical management or ownership.

As for business purposes, while both North American and K.A.N. operate in the elevator industry, North American provides a wider array of services than K.A.N. JSF ¶¶ 31–33, 65; Pl. 56.1 ¶ 55. These facts do not dictate a finding one way or the other as to shared business purposes. *Compare ITRI Brick*, 1997 WL 678164, at *15 (shared business purpose where both entities performed masonry construction), *Fortune Interiors*, 2015 WL 4503630, at *1–2, 5 (shared business purpose where both entities largely performed the same work), *and Labarbera*, 2007 WL 4232765, at *1–2, 7 (shared business purpose where both entities performed the same work even though each also performed other types of work), *with Lihli*, 80 F.3d at 749 (no shared business purpose where one entity manufactured clothing and the other sold and marketed it), *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640,

---

[6] "The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807*, 944 F.2d at 1046. Thus, if North American and K.A.N. were found to be alter egos of one another, North American would be liable not only for K.A.N.'s delinquent contributions to the Funds, but also for contributions on behalf of its own employees. *See Brown*, 250 F.3d at 128 n.3 (finding two entities alter egos has the same effect on the non-signatory as a finding the two entities a single employer and single employee bargaining unit).

650 (2d Cir. 2005) (no shared business purpose where companies "engaged in different, though related, lines of business within the freight transportation industry").

Finally, there is no direct evidence of anti-union animus here, and plaintiffs do not press the point. *See* Pl. Br. 22. Nevertheless, circumstantial evidence in the summary judgment record might point toward purposeful evasion of union responsibilities. For instance, North American employees used K.A.N. timesheets to request pay for their work on one union-labor project, *see* Pl. Counter 56.1 ¶ 188, as to which Curran signed the contract between K.A.N. and the project's general contractor, *see* First Dickerson Decl. Ex. 76. Likewise, bank statements from that project at least arguably indicate that payments made to K.A.N. were promptly transferred to North American. *See* First Dickerson Decl. Ex. 78; Second Dickerson Decl. Ex. 100. Accordingly, the Court cannot determine conclusively whether either defendant sought through the other to evade its obligations under the labor laws.

In sum, because the parties have not supplied conclusive evidence demonstrating that defendants either are or are not alter egos, this question, too, must be left for a jury.

## CONCLUSION

For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment. The Clerk of Court is respectfully directed to close the motions pending at Dkts. 86 and 103. An order will issue shortly as to next steps in this matter.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 5, 2018
New York, New York